# EXHIBIT B

Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Mahru Madjidi, Esq., State Bar No. 297906
MMadjidi@Shegerianlaw.com
Bryan Kirsh, Esq., State Bar No. 318238
BKirsh@Shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
11520 San Vicente Boulevard
Los Angeles, California 90049
Telephone Number: (310) 860 0770
Facsimile Number:  (310) 860 0771

Attorneys for Plaintiff,
DON LEMON

ELECTRONICALLY
F I L E D
Superior Court of California,
County of San Francisco

08/01/2024
Clerk of the Court
BY: SHENEQUA GLADNEY
Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN FRANCISCO

DON LEMON,

     Plaintiff,

vs.

ELON MUSK; X CORP. DOING
BUSINESS IN CALIFORNIA AS,
X CORP., A NEVADA
CORPORATION; and DOES 1 to 100,
inclusive,

     Defendants.

Case No.: **CGC-24-616892**

**PLAINTIFF DON LEMON'S
COMPLAINT FOR DAMAGES FOR:**

  **(1) FRAUD;**

  **(2) NEGLIGENT
     MISREPRESENTATION;**

  **(3) MISAPPROPRIATION OF NAME
     AND LIKENESS (COMMON LAW);**

  **(4) MISAPPROPRIATION OF NAME
     AND LIKENESS (CIVIL CODE §
     3344);**

  **(5) BREACH OF EXPRESS
     CONTRACT; AND**

  **(6) UNJUST ENRICHMENT.**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

PARTIES ....................................................................................................... 3

JURISDICTION AND VENUE ...................................................................... 5

FACTUAL ALLEGATIONS .......................................................................... 6

    Lemon's Exemplary Career as a Journalist ............................................... 6

    Advertising Revenue Drops Drastically After Musk Purchases X (Formerly
    Known as Twitter) ..................................................................................... 7

    Defendants Sought Out Lemon to Enter Into an Exclusive Partnership Deal
    Amid Their Ongoing Struggle to Retain Advertisers ................................. 8

    Defendants Make False Representations and Promises to Lemon ............... 9

    Lemon Agrees to an Exclusive Partnership Deal Based Upon Defendants'
    False Promises and Misrepresentations .................................................. 10

    Lemon Justifiably Relies on the False Promises and Representations Made by
    Defendants and Enters Into an Exclusive Partnership Deal ...................... 11

    Lemon is Harmed as a Result of His Justifiable Reliance on Defendants'
    Misrepresentations and Defendants Benefited ........................................ 12

    The Interview Between Musk and Lemon ............................................... 14

    Lemon is Damaged as Defendants Demonstrate Their Fraudulent Behavior ... 14

FIRST CAUSE OF ACTION ........................................................................ 16

    (Fraud—Against All Defendants and Does 1 to 100, Inclusive) .............. 16

SECOND CAUSE OF ACTION .................................................................... 18

    (Negligent Misrepresentation—Against All Defendants and Does 1 to 100,
    Inclusive) ................................................................................................ 18

THIRD CAUSE OF ACTION ....................................................................... 20

    (Misappropriation of Name and Likeness (Common Law)—Against
    Defendant X. Corp. and Does 1 to 100, Inclusive) .................................. 20

FOURTH CAUSE OF ACTION .................................................................... 22

    (Misappropriation of Name and Likeness (Civil Code § 3344)—Against
    Defendant X. Corp. and Does 1 to 100, Inclusive) .................................. 22

FIFTH CAUSE OF ACTION ........................................................................ 23

(Breach of Express Contract—Against Defendant X. Corp. and Does 1 to 100, Inclusive) .................................................................................. 23

SIXTH CAUSE OF ACTION ........................................................................... 24

(Restitution and Unjust Enrichment—Against All Defendants and Does 1 to 100, Inclusive) .................................................................................. 24

PRAYER FOR RELIEF ................................................................................... 25

DEMAND FOR JURY TRIAL ........................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## Statutes

Civil Code § 3294                                        2, 16

Civil Code § 3344                                       22, 23

Code of Civil Procedure § 474                                4

Code of Civil Procedure § 395                                5

Code of Civil Procedure § 395.5                              5

Code of Civil Procedure § 3291                               2

PLAINTIFF'S COMPLAINT FOR DAMAGES

Plaintiff, Don Lemon (hereafter "Plaintiff" or "Lemon"), alleges, on the basis of personal knowledge and/or information and belief:

## INTRODUCTION

Plaintiff Don Lemon is an American journalist best known for his work with CNN from September 2006 until his tenure ended in April 2023. Relatable and charismatic, Lemon's work defies genre, candidly exposing injustice and the resiliency of the human spirit. At all times throughout his career, Lemon has been an exemplary journalist known *"for sticking his finger in the eyes of powerful people [including politicians and public officials], asking uncomfortable questions, and, as a Black, gay man, fighting to make diverse viewpoints heard."*

Following Musk purchasing X (at the time known as Twitter), Musk fired top executives, laid off a significant portion of staff, and reinstated banned accounts. In response, major companies suspended and decreased their advertising on X. Amid Defendants ongoing struggle to retain advertisers, Defendants sought to affiliate with reputable figures whose name, likeness and reputation they could use to piggyback off of to retain advertisers. Lemon was a top prospect for X, and thus, Defendants saw an opportunity and sought to reach an exclusive partnership deal with Lemon, following his termination at CNN, at a time when Lemon was vulnerable.

After Lemon rightfully expressed reservations about agreeing to an exclusive partnership deal given the ongoing controversies surrounding the X platform, Defendants remained undeterred, going on to induce Lemon through false promises and representations about what would be expected of them and how much Lemon would be compensated to get him to agree, all while concealing material facts from Lemon. Defendants did this to accomplish what they truly intended to do—publicize a partnership between X and Lemon, and thereby associate and promote the X brand with Lemon's good name, likeness, identity, and reputation, to: (a) rehabilitate Defendants' reputation; (b) promote the partnership and Defendants' association with Lemon on Defendants' website

(www.x.com), social media accounts, at promotional events, and elsewhere, to sell advertisers on the X platform; and (c) otherwise profit and gain advantage commercially.

Contrary to the promises and representations made to Lemon, once Defendants were enriched and gained the benefits of using Lemon's name, likeness, identity, and reputation, they reneged on their express agreement with Lemon and have failed to compensate him, citing to false pretenses for their breach of the partnership agreement. This breach came after Lemon spent considerable time, effort, and resources in creating exclusive content for Defendants. Lemon had gone to great lengths and incurred hundreds of thousands of dollars of expenses in forming his own media company, collaborating with his agents based in California on what his new show would look like, seeking business proposals from numerous production companies, entering into a production deal with a content studio and production company, creating a production studio where he could record his video content, purchasing production equipment, hiring a production staff, and assembling a production team.

Defendants deliberately misrepresented what they intended to do. Defendants knew that if they accurately represented to Lemon that the purpose and meaning of the exclusive partnership deal was to use Lemon's name, likeness, reputation, and identity to rehabilitate Defendants reputation and draw in advertisers to the X platform, Lemon would never have agreed to do what he did and Defendants would have been unable to utilize Lemon to keep up with their ongoing efforts to woo advertisers.

Plaintiff brings this action against defendants for economic, non-economic, and punitive damages pursuant to Civil Code section 3294, prejudgment interest pursuant to Code of Civil Procedure section 3291, injunctive relief, costs, and any further relief this Court deems appropriate.

///

///

///

///

## PARTIES

1. *Plaintiff:* Plaintiff Don Lemon ("Plaintiff" or "Lemon") is, and at all times mentioned in this Complaint was, a resident of New York County, New York.

2. *Defendants:*

a. Defendant X Corp., doing business in California as X Corp., a Nevada Corporation ("X Corp." or "X") is, and at all times mentioned in this complaint was, a corporation doing business in San Francisco County, California. At all relevant times, Defendant's principal place of business was located at 1355 Market Street, Suite 900, San Francisco, CA 94103. X Corp. owns, operates and controls the social networking service, "X" (formerly referred to and known as Twitter), currently located at www.x.com. The X Platform enables account holders to distribute content via text, images, videos, and other multimedia-based messages.

b. Defendant Elon Musk ("Musk") is, and at all times mentioned in this Complaint was, a resident of Texas. Prior to 2019, Musk was an individual residing in California. Defendant Musk, who made the promises and representations herein alleged, is, and at all times mentioned in this Complaint was, the Chief Financial Officer, Secretary, and/or an employee for X. At the time the representations and promises herein alleged were made, Musk was acting for the benefit of Defendants and within the course and scope of his agency, employment, authority, and/or apparent authority for Defendants.

3. Linda Yaccarino ("Yaccarino") is, and at all times mentioned in this Complaint was, a resident of New York. At the time the representations and promises herein alleged were made, Yaccarino was the Chief Executive Officer and/or an employee for Defendant X. At the time the representations and promises herein alleged were made,  Yaccarino was acting for the benefit of Defendants and within the course and scope of her agency, employment, authority, and/or apparent authority for Defendants.

4. Brett Weitz ("Weitz") is, and at all times mentioned in this Complaint was, a resident of California. At the time the representations and promises herein alleged were made, Weitz served as the Head of Content, Talent, and Brand Sales and/or an employee

for Defendant X. At the time the representations and promises herein alleged were made, Weitz was acting for the benefit of Defendants and within the course and scope of his agency, employment, authority, and/or apparent authority for Defendants.

5.   *Doe defendants:* Defendants Does 1 to 100, inclusive, are sued under fictitious names pursuant to Code of Civil Procedure section 474. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants sued under fictitious names is in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, servant, partner, and employee of the co-defendants, and in taking the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner, and employee, with the permission and consent of the co-defendants.  The named defendants and Doe defendants are sometimes hereafter referred to, collectively and/or individually, as "defendants."

6.   *Relationship of Defendants:* All defendants were responsible for the events and damages alleged herein, including on the following bases: (a) defendants committed the acts alleged; (b) at all relevant times, one or more of the defendants was the agent or employee, and/or acted under the control or supervision, of one or more of the remaining defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment and/or is or are otherwise liable for plaintiff's damages; (c) at all relevant times, there existed a unity of interest between or among two or more of the defendants such that any individuality and separateness between or among those defendants has ceased. Defendants exercised domination and control over one another to such an extent that any individuality or separateness of defendants does not, and at all times herein mentioned did not, exist. All actions of all defendants were taken by authorized personnel, elected officials, employees, supervisors, executives, officers, and directors with all defendants, were taken on behalf of all defendants, and were engaged in, authorized, ratified, and approved of by all other defendants.

7.   Finally, at all relevant times mentioned herein, all defendants acted as agents of all other defendants in committing the acts alleged herein.

## JURISDICTION AND VENUE

8.   Pursuant to Code of Civil Procedure section 395(a), venue is proper in the Superior Court in the County where the defendants, **_or some of them_** reside at the commencement of the action.  Pursuant to Code of Civil Procedure section 395.5, venue is proper in the county where the principal place of business of the corporation is situated. As a result, venue is proper because Defendant X is a corporation that is doing business, or has done business during the times relevant herein, in San Francisco, California. At all relevant times, Defendant X's principal place of business is in San Francisco, California, and does business out of San Francisco, California.

9.   This Court has personal jurisdiction over Defendant X because its principal place of business is located in San Francisco County, California.

10.   This Court has personal jurisdiction over Defendant X and Defendant Musk because each defendant has sufficient minimum contacts with California, has purposely availed itself to California's benefits and protection, and does a substantial amount of business in California, such that the Court's exercise of jurisdiction over each Defendant is wholly consistent with traditional notions of fair play and substantial justice.

a.   The causes of action in this Complaint arise from Defendants, including the agents and representatives of Defendants, transacting and conducting business in California and/or causing tortious injury by an act or omission in California.

b.   Defendants' misrepresentations and false promises that form the basis of Lemon's lawsuit were received by Lemon's agents and representatives, who at the time were located in, reside in, and are domiciled in California.

c.   Defendants' misrepresentations and false promises that form the basis of Lemon's lawsuit were made by Defendants' agents, representatives, and employees, who at the time were located in, reside in, and are domiciled in California.

d.   Defendants made representations and promises to Lemon, and engaged in other acts related to this lawsuit for the benefit of Defendant X, whose principal place of business is located in San Francisco County, California.

e.   One statement giving rise to this lawsuit was sent directly by Musk to one of Lemon's agents, who works and lives in California.

f.   Lemon suffered damage in the State of California, as the direct and proximate result of Defendants' actions.

g.   Musk knew that his conduct against Lemon would be conveyed to a California audience and would result in the accusations receiving massive publicity.

h.   As a result, Defendants could have—and indeed should have—reasonably foreseen being subject to a lawsuit based in a California court.

## FACTUAL ALLEGATIONS

### Lemon's Exemplary Career as a Journalist

11.   Plaintiff Don Lemon ("Lemon" or "Plaintiff") is an American journalist and trusted information source best known for his work with CNN from September 2006 until his tenure ended in April 2023. Relatable and charismatic, Lemon's work defies genre, candidly exposing injustice and the resiliency of the human spirit. At all times throughout his career, Lemon has been an exemplary journalist known *"for sticking his finger in the eyes of powerful people [including politicians and public officials], asking uncomfortable questions, and, as a Black, gay man, fighting to make diverse viewpoints heard."*

12.   Lemon reported and anchored on-the-scene for CNN in many breaking news stories, including numerous mass shooting incidents, the death of Freddie Gray while in police custody, the shooting of unarmed teenager Michael Brown in Ferguson, Missouri, the George Zimmerman trial, the Boston Marathon bombing, the deaths of Whitney Houston and Michael Jackson, and the inauguration of the 44th president in Washington, DC. Lemon reported for CNN's documentary Race and Rage: The Beating of Rodney King, which aired 20 years to the day of the tragic incident.

13.   Lemon's influence, direction, and execution as a journalist has led to recognition with numerous awards—including the 2005 Edward R. Murrow Award, three regional Emmy Awards in 2006, and other awards. Lemon was named one of the 150 most

influential African Americans by *Ebony* magazine in 2009, named as one of the 50 most influential LGBTQ People in Media by *The Advocate* in 2014, and in June 2019, was named as one of the *Pride50* "trailblazing individuals who actively ensure society remains moving towards equality, acceptance and dignity for all queer people."

14.   Lemon has deliberately and carefully promulgated a certain image and reputation, which ensured that he would be taken seriously as a journalist.

### Advertising Revenue Drops Drastically After Musk Purchases X
### (Formerly Known as Twitter)

15.   In October 2022, Musk completed his move to purchase X (at the time known as Twitter). After the takeover, Musk fired top executives, laid off a significant portion of staff, and reinstated banned accounts. In response, major companies suspended and decreased their advertising on X amid growing concerns. Ultimately, *X's advertising revenues declined 60% year-over-year through August 2023* as X struggled to make deals with major advertising brands.



**Defendants Sought Out Lemon to Enter Into an Exclusive Partnership
Deal Amid Their Ongoing Struggle to Retain Advertisers**

16.   Amid Defendants' ongoing struggle to retain advertisers, Defendants sought to affiliate with reputable figures whose name, likeness, identity, and reputation they could use to piggyback off of to retain advertisers. Lemon was a top prospect. A gay, Black man with an excellent reputation and a household name, he was the perfect candidate to partner with to aid their dying advertisement revenue.

17.   Defendants saw their opportunity to plant this seed with Lemon in May 2023, shortly after Lemon was terminated by CNN, and started publicly seeking an exclusive partnership deal with Lemon. Aware of Lemon's vulnerable state, Musk responded to Lemon's post on X announcing that CNN terminated him. In the post dated May 9, 2023, Musk stated:



18.   On June 8, 2023, Musk again publicly encouraged Lemon to join the platform in a post on X: ***"It'd be great to have @maddow, @donlemon & others on the left put their shows on this platform."***

19.   During Lemon's June 16, 2023 phone conversation with Musk, Musk asked Lemon to enter into an exclusive partnership deal with X and commented to him: ***"I want you on the [X] platform"*** and ***"this is what you should be doing."*** Lemon expressed reservations about entering into a partnership with X due to the ongoing controversies surrounding the X platform. In response, and to induce Lemon to enter into an exclusive partnership deal with X, Musk represented to Lemon that he would have full authority and control over the work he produced even if disliked by Defendants, and that there would be no need for a formal written agreement or to "fill out paperwork."

20.   In November 2023, Defendants' ongoing struggle to retain advertisers magnified

as major companies halted their advertising spending on X, including IBM, Apple, and Disney. Defendants were now in a rush to publicly announce a partnership with Lemon.

**Defendants Make False Representations and Promises to Lemon**

21.  On December 14, 2023, Lemon attended an in-person meeting with Yaccarino and Weitz at Da Umberto Italian Restaurant in New York City to discuss the potential of a partnership. During the meeting, Lemon told Yaccarino and Weitz that it was important for him to maintain his journalistic integrity and that the next step in his career following his termination at CNN was a pivotal one. Because of the ongoing controversies surrounding the X platform, Lemon expressed that he was hesitant to enter into a partnership with X unless he had Defendants' full support. In response, and to induce Lemon to enter into a partnership with X, or at least to announce that partnership, Yaccarino and Weitz assured Lemon that he had Defendants' full support, that Lemon would have full authority over his work and should not have concerns about Defendants imposing on his work or not agreeing with anything he does.

22.  Following the meeting with Yaccarino and Weitz, Lemon remained undecided on committing to a partnership with Defendants. However, Defendants would not be deterred. Defendants continued to make these same representations to Lemon, including that he would have full authority and control over the work he produced even if disliked by Defendants.

23.  Moreover, Defendants started to induce Lemon by promising a revival of his career following his termination with CNN, knowing that he was in a particularly vulnerable and susceptible state.

        a.  On December 24, 2023, Yaccarino told Lemon and his agent via text: *"Getting ready to toast all of you…..many times!"*

        b.  On December 30, 2023, Weitz told Lemon via text: *"You're set up for a lot of $$ this year"* and *"You're gonna make money faster than you think!"*

        c.  On December 31, 2023, Yaccarino told Lemon via text: *"On the doorstep of*

*a new year and an epic partnership I just wanted to reach out and assure you of my personal commitment. You are an incredible talent and X will make sure you have the global platform you deserve."*

       d.   On January 6, 2024, Weitz told Lemon via text: *"My job is to make sure that you feel like you're in good company on the platform and I'm gonna do everything in my power to make sure that happens. This will be an awesome adventure for both of us."*

## Lemon Agrees to an Exclusive Partnership Deal Based Upon Defendants' False Promises and Misrepresentations

24.   After a series of negotiations with Lemon's agents and Lemon's transparency about his hesitations—Defendants, as a means to induce Lemon to agree to this exclusive partnership deal with X, then represented to Lemon on or around January 8, 2024 that he would receive a ***one-year deal*** with X if he agreed to provide Defendants exclusive rights to specific video content for a 24-hour period before it could be dispersed to other platforms: **(1)** one piece of long-form video content (that is not breaking news) per week; and **(2)** ten pieces of short-form video content per month.

25.   In exchange, Defendants agreed they would pay him $1,500,000 guaranteed ($200,000 paid up-front within 3 business days and the remainder paid in quarterly installments), with additional incentives including—**(1)** the option to renew the one-year deal two times with the same terms, at Lemon's sole discretion; **(2)** 60 percent of the gross advertising revenue that X received for programmatic advertising generated from Lemon's content on X; **(3)** performance threshold payments ($250,000 for reaching 4 million followers, $500,000 for reaching 6 million followers, $750,000 for reaching 8 million followers, and $1,000,000 for reaching 10 million followers); **(4)** $500,000 in advertising credits on the X Platform; **(5)** for a period of 48 months, 10 percent of the net revenue that X receives once it exceeds $350,000 for content creators that Lemon referred to X; and **(6)** that all content created by Lemon (and its underlying intellectual property) originating on or distributed on X is wholly-owned by him.

**Lemon Justifiably Relies on the False Promises and Representations**

**Made by Defendants and Enters Into an Exclusive Partnership Deal**

26.   After Defendants persistent and ongoing material promises and representations referenced above, including that Lemon would have Defendants' full support, as well as full authority and control over the work he produced even if disliked by Defendants, Lemon agreed to enter this exclusive partnership deal with Defendants on or about January 8, 2024. Lemon entered into this exclusive partnership deal in reliance upon Defendants' material representations and promises referenced above. Lemon would not have agreed to enter into this exclusive partnership deal with Defendants if he had known that Defendants would fail to deliver on these representations and promises.

27.   Lemon, at the time the aforementioned promises and representations were made by Defendants and at the time he took the actions herein alleged, was ignorant of the falsity of Defendants' promises and representations and believed them to be true. In reliance on these representations, Lemon was induced to and entered this exclusive partnership deal with Defendants. Had Lemon known the actual facts and intentions of Defendants, he would not have taken such action. Lemon's reliance upon Defendants' misrepresentations and false promises was justified because, among other reasons:

a.   Lemon had known Yaccarino to be a successful, well-respected media executive during her long tenures at NBCUniversal and at Turner before agreeing to join X as the CEO in or around May 2023. After joining X, Yaccarino made representations directly to Lemon, and representations to other groups in the presence of Lemon, explaining that Defendants were creating a platform that is palatable to advertisers, which in turn would lead to a profitable venture for both Defendants and Lemon.

b.   Lemon was rushed by Defendants into agreeing to the exclusive partnership deal. Shortly before Lemon agreed to the exclusive partnership deal on or around January 8, 2024, Defendants informed Lemon that the terms of their offer would be withdrawn unless he attended the CES Conference in Las Vegas and that Lemon make a social media post announcing their partnership to the public on the same day. Based upon the foregoing,

including but not limited to Lemon's knowledge of Yaccarino's reputation as a successful media executive, Lemon agreed to enter into the exclusive partnership deal.

### Lemon is Harmed as a Result of His Justifiable Reliance on Defendants' Misrepresentations and Defendants Benefited

28.   As a result of Lemon's justifiable reliance on Defendants' false promises and misrepresentations, Lemon agreed to the exclusive partnership deal, promoted Defendants' business to advertisers on his social media and at marketing events, and put his own reputation at stake by associating himself with Defendants.

29.   Meanwhile, *Defendants never intended to fulfill their representations and promises to Lemon*. Instead, at a time when Defendants were under intense criticism and losing advertisers, *Defendants only intended to publicize a partnership between X and Lemon, and thereby associate and promote the X brand with Lemon's good name, likeness, identity, and revered reputation*, in order to: (a) rehabilitate Defendants' reputation; (b) promote the partnership and their association with Lemon on Defendants' website (www.x.com), social media accounts, at promotional events, and elsewhere to sell advertisers on the X platform; and (c) otherwise profit and gain advantage commercially.

30.   On or around January 9, 2024, Lemon attended the CES conference. There, Yaccarino had Lemon join her with advertisers as she tried to talk up the exciting future ahead with Defendants because of their partnership with Lemon. In addition to announcing the new partnership between Defendants and Lemon in a publicly made post on X, Defendants announced two other partnerships with former U.S. congresswoman, Tulsi Gabbard, and sports commentator, Jim Rome.

31.   Moreover, in announcing X's "new content partnership" with Lemon, X stated that *"The Don Lemon Show"* will share his *"unique and honest voice in 30-minute episodes, three times a week, covering politics, culture, sports and entertainment."*



32.   Following this statement, ***Lemon made X's top trending topics in the United States*** and, as stated by Weitz, was ***"by far the largest [announcement that X] got!"***



33.   In addition, Lemon's well-known reputation, likeness, identity, and good name was used by Defendants for their commercial benefit as Musk and Yaccarino welcomed Lemon to the X platform in publicly made posts on X.

34.   Later that night, Defendants touted Lemon as their "partner" that would bring a diverse perspective and powerful voice to the X platform during an exclusive dinner with major advertising brands that were invited including: Brand Innovators, Lenovo, Magic Leap, MediaLink, MNTN, Movers and Shakers, Mtailor, NFL, Qualcomm, Range Media, Salesforce, and Stagwell. There, Lemon, after being pressured by Defendants to make a speech on their behalf, praised X in front of the attendees.

35.   The next day, Yaccarino wrote to Lemon: "*Thank you for joining us yesterday at a momentous dinner that ... was memorable and a big turning point. It marked a new chapter for X....*" Throughout the remainder of the CES conference, Defendants continued to entice advertisers to return to the X platform relying on their partnership with Lemon and even tried hosting a big party for advertisers with Lemon as the focal point.

36.   Between approximately January 2024 and approximately February 2024, Defendants continued to use Lemon's name, likeness, identity, and reputation in marketing and promotional activities on Defendants' website, social media accounts, at

promotional events, in meetings, and elsewhere for Defendants' commercial benefit.

37.   On or about February 28, 2024, X continued to promote and sell Lemon's good name, likeness, identity, and reputation to advertisers by pressuring him to appear on a Talent Panel at Defendants' Client Council Meeting. There, X presented Lemon as part of its ongoing efforts to woo advertisers in a meeting *full of the brightest and most influential marketing leaders in the business.* After the meeting, Yaccarino praised Lemon *for playing a critical role in creating a "transformational year" for Defendants*.

**The Interview Between Musk and Lemon**

38.   Lemon interviewed Musk on March 8, 2024, for the first episode of "The Don Lemon Show." By this time, Lemon had spent a considerable amount of time, effort, and resources in creating exclusive content for Defendants, all to his detriment. Lemon had spent hundreds of thousands of dollars creating his own media company, collaborated with his agents based in California on what his new show would look like, sought business proposals from numerous production companies, entered into a production deal with a content studio and production company, created a production studio where he could record his video content, purchased production equipment, hired a production staff, and assembled a production team. Meanwhile, Defendants continued to lack any intent to fulfill their representations and promises to Lemon and failed to issue a single payment to Lemon despite his requests pursuant to their express agreement.

**Lemon is Damaged as Defendants Demonstrate Their Fraudulent Behavior**

39.   Within one day of the interview, Musk sent Lemon's agent a text message stating that Lemon's partnership *"contract [with Defendants] is cancelled."* Close to this time, Weitz spoke with Lemon by phone and told Lemon that Defendants were not going to pay him or follow through with the promises and representations made to him because there was no signed agreement, despite Musk previously representing to Lemon that there would be no need for a formal written agreement or to "fill out paperwork." To this day,

Defendants have not compensated Lemon pursuant to the exclusive partnership deal that Defendants induced Lemon to enter into.

40.   Later, Defendants claimed that they never entered into a partnership deal with Lemon, which demonstrates the fraudulent nature of Defendants' promises and representations in that they *had already* entered into an express agreement with Lemon and were instead violating that partnership. As a result, Defendants have provided false and inconsistent reasons for refusing to pay Lemon that completely contradicts what Musk told Lemon's agent in his text message.

41.   Defendants deliberately misrepresented what they intended to do. Defendants knew that if they accurately represented to Lemon that the purpose and meaning of the exclusive partnership deal was to use Lemon's name, likeness, reputation, and identity to rehabilitate Defendants' reputation and draw in advertisers to the X platform, Lemon would never had agreed to do what he did and Defendants would have been unable to utilize Lemon to keep up with its ongoing efforts to woo advertisers.

42.   Defendants' failure to follow through on their promises and representations demonstrates a reckless disregard of Lemon's rights and the promises and representations made to him. Lemon and his reputation were damaged by Defendants' false promises and representations, economically and non-economically.

43.   Musk, Yaccarino and Weitz—acting as managing agents and in the course and scope of their agency and/or employment with X and/or on X's behalf and in furtherance of Defendants' business interests, with X's knowledge, consent, authority, and/or ratification—intentionally, willfully, purposefully, and maliciously made these false representations and promises to Lemon.

44.   *Economic damages:* As a consequence of defendants' conduct, plaintiff has suffered and will suffer harm, including special damages and damage to his career in a sum to be proven at trial.

45.   *Non-economic damages:* As a consequence of defendants' conduct, plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and

physical pain and anguish, in a sum to be proven at trial.

46. *Punitive damages:* Defendants' misconduct constitutes oppression, fraud, and/or malice under California Civil Code section 3294 and, thus, entitles plaintiff to an award of exemplary and/or punitive damages.

    a. *Malice:* Defendants' conduct was committed with malice within the meaning of California Civil Code section 3294, including that (a) defendants acted with intent to cause injury to plaintiff and/or acted with reckless disregard for plaintiff's injury, and/or (b) defendants' conduct was despicable and committed in willful and conscious disregard of plaintiff's rights, health, and safety.

    b. *Oppression*: In addition, and/or alternatively, defendants' conduct has been committed with oppression within the meaning of California Civil Code section 3294, including that defendants' actions against plaintiff were "despicable" and subjected plaintiff to cruel and unjust hardship.

    c. *Fraud:* In addition, and/or alternatively, defendants' conduct, as alleged, was fraudulent within the meaning of California Civil Code section 3294, including that defendants engaged in trickery and deceit concerning their own documents and spreading of defamatory comments about plaintiff Lemon.

47. *Attorneys' fees:* Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

## FIRST CAUSE OF ACTION
## (Fraud—Against All Defendants and Does 1 to 100,
## Inclusive)

48. The allegations set forth in the above paragraphs are re-alleged and incorporated herein by reference.

49. Defendants intentionally made false representations and/or promises to Lemon knowing that he would rely on those false representations and/or promises to enter into an exclusive partnership deal with Defendants. The false representations and/or promises that

Defendants told Lemon include at least the following: (1) Lemon would have full authority and control over the work he produced even if disliked by Defendants; and (2) there would be no need for a formal written agreement or to "fill out paperwork."

50.   Defendants' representations were in fact false when they were made.

51.   Defendants had no intention of performing these promises at the times they were made and have not performed as promised.

52.   Knowing they would not be able to fulfill their representations and their falsity, Defendants made these representations recklessly and without regard for their truth, and/or with no reasonable grounds for believing them to be true.

53.   At the time that Defendants made the aforementioned representations and/or promises to Lemon, Defendants made them with the intent of inducing Lemon to rely on them by entering into an exclusive partnership deal so that Defendants could *publicize a partnership between X and Lemon, and thereby associate and promote the X brand with Lemon's good name, likeness, and revered reputation*, in order to: (a) rehabilitate Defendants' reputation; (b) promote the partnership and their association with Lemon on Defendants' website (www.x.com), social media accounts, at promotional events, and elsewhere to sell advertisers on the X platform; and (c) otherwise profit and gain advantage commercially.

54.   At all relevant times, Lemon was ignorant of the falsity of Defendants' representations and promises, and believed them to be true. In reliance on Defendants' representations and promises, Lemon was induced to and did enter into an exclusive partnership deal with X and spent a considerable amount of time, effort, and resources in creating exclusive content for Defendants. Had Lemon known the actual facts and intentions of Defendants, he would not have taken such action. Lemon reasonably relied on Defendants' misrepresentations and false promises, and Lemon's reliance was justified.

55.   Defendants concealed facts material to Lemon's decision to enter into an exclusive content partnership deal with Defendants. Defendants intended to deceive Lemon by concealing these facts and Lemon did not know about these concealed facts.

56.   Defendants had a duty to disclose concealed facts to Lemon because they: (1) affirmatively represented the opposite to Lemon; (2) disclosed some facts to Lemon but intentionally failed to disclose other facts thereby making the disclosure deceptive; (3) intentionally failed to disclose facts to Lemon that were known only to Defendants and that Lemon could not have discovered; (4) Defendants prevented Lemon from discovering facts; and/or (5) by virtue of Defendants being in a fiduciary relationship with Lemon. Defendants' omission of such information, had it been disclosed, would have caused Lemon to not enter into this exclusive partnership deal with Defendants and/or not perform work pursuant to the exclusive partnership deal.

57.   Lemon has been harmed by his reasonable reliance, including that Defendants failed to provide Lemon full authority and control over the work he produced even if disliked by Defendants, failed to abide by its promise and/or representation that there would be no need for a formal written agreement or to "fill out paperwork," and failed to pay Lemon.

58.   As a proximate result of Defendants' fraudulent conduct, Lemon has suffered and continues to suffer economic harm, including monetary, fees, and interest, in a sum according to proof.

59.   As a proximate result of Defendants' fraudulent conduct, Lemon has suffered and continues to suffer emotional distress and mental pain and anguish, all to his damage in a sum according to proof.

60.   Defendants' conduct was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, entitling Lemon to punitive damages against Defendants.


## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation—Against All Defendants and Does 1 to 100, Inclusive)

61.   The allegations set forth in the above paragraphs are re-alleged and incorporated

herein by reference.

62.   Defendants intentionally made false representations and/or promises to Lemon knowing that he would rely on those false representations and/or promises to enter into an exclusive partnership deal with Defendants. The false representations and/or promises that Defendants told Lemon include at least the following: (1) Lemon would have full authority and control over the work he produced even if disliked by Defendants; and (2) there would be no need for a formal written agreement or to "fill out paperwork."

63.   Defendants' representations were in fact false when they were made.

64.   Knowing they would not be able to fulfill their representations and their falsity, Defendants made these representations recklessly and without regard for their truth, and/or with no reasonable grounds for believing them to be true.

65.   At the time Defendants made the aforementioned representations and/or promises to Lemon, Defendants made them with the intent of inducing Lemon to rely on them by entering into an exclusive partnership deal so that Defendants could *publicize a partnership between X and Lemon, and thereby associate and promote the X brand with Lemon's good name, likeness, and revered reputation*, in order to: (a) rehabilitate Defendants reputation; (b) promote the partnership and their association with Lemon on Defendants website (www.x.com), social media accounts, at promotional events, and elsewhere to sell advertisers on the X platform; and (c) otherwise profit and gain advantage commercially.

66.   At all relevant times, Lemon was ignorant of the falsity of Defendants' representations and believed them to be true. In reliance on Defendants' representations and promises, Lemon was induced to and did enter into an exclusive content partnership deal with X and spent a considerable amount of time, effort, and resources in creating exclusive content for Defendants. Had Lemon known the actual facts and intentions of Defendants, he would not have taken such action. Lemon reasonably relied on Defendants' false representations, and Lemon's reliance was justified.

67.   Lemon has been harmed by his reasonable reliance, including that Defendants

failed to provide Lemon full authority and control over the work he produced even if disliked by Defendants, failed to abide by its representation that there would be no need for a formal written agreement or to "fill out paperwork," and failed to pay Lemon.

68.   As a proximate result of Defendants' actions, Lemon has suffered and continues to suffer economic harm, including monetary, fees, and interest, in a sum according to proof.

69.   As a proximate result of Defendants' actions, Lemon has suffered and continues to suffer emotional distress and mental pain and anguish, all to his damage in a sum according to proof.

70.   Defendants' conduct was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, entitling Lemon to punitive damages against Defendants.

## THIRD CAUSE OF ACTION

### (Misappropriation of Name and Likeness (Common Law)—
### Against Defendant X. Corp. and Does 1 to 100, Inclusive)

71.   Defendants used Lemon's name, likeness, photo, reputation, and/or identity to promote, market, and advertise their products and services without Lemon's authorization or consent, through fraud, and/or without promised consideration. Defendants specifically used Lemon's name, likeness, photo, reputation, and/or identity to: (a) rehabilitate Defendants' reputation; (b) market and advertise the partnership and their association with Lemon on Defendants' website (www.x.com), social media accounts, at promotional events (including the CES Conference and X's Client Council meeting), and elsewhere to sell advertisers on the X platform; and (c) otherwise profit and gain advantage commercially.

72.   Any release, license, consent, or authorization purporting to give Defendants use of Lemon's name, likeness, photo, reputation, and/or identity, is unenforceable due to unclear terms, a lack of mental capacity/competence, mistake, undue influence, and/or

Defendants' unclean hands.

73. Defendants did not have a license, authorization, or consent to use Lemon's name, likeness, image, photo, reputation, and identity when it did so without his authorization or consent, which was improper based upon fraud and has operated to undermine years of Lemon's careful career planning.

74. Defendants' knowing use of Lemon's name, likeness, photo, reputation, and/or identity was for Defendants' commercial or other benefit.

75. The acts and omissions were authorized and ratified by Defendants.

76. Lemon is a nationally recognized journalist who is paid to endorse products and services through advertisements and through his association with such products and services. Lemon was deprived of the monetary value of having his name, likeness, photo, reputation, and identity used by Defendants and therefore, was deprived of money to which he was entitled.

77. Lemon's reliance on Defendants' fraud was a substantial factor in causing him harm.

78. As a proximate result of the foregoing, Lemon has suffered actual damages, including emotional distress damages and loss of reputation and standing in the community, in an amount to be proved at trial but in any event in excess of the jurisdictional threshold of the Superior Court.

79. As a proximate result of the foregoing, Lemon also seeks as damages any profits from Defendants' unauthorized use of Lemon's name, likeness, photo, reputation, and identity that are attributable to the use.

80. Defendants' conduct was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, entitling Lemon to punitive damages against Defendants.

///

///

///

## FOURTH CAUSE OF ACTION

## (Misappropriation of Name and Likeness (Civil Code § 3344)—Against Defendant X. Corp. and Does 1 to 100, Inclusive)

81. Defendants knowingly and intentionally used Lemon's name, likeness, photo, reputation, and/or identity to promote, market, and advertise their products and services without Lemon's authorization or consent, through fraud, and/or without promised consideration. Defendants specifically used Lemon's name, likeness, photo, reputation, and/or identity to: (a) rehabilitate Defendants' reputation; (b) market and advertise the partnership and their association with Lemon on Defendants' website (www.x.com), social media accounts, at promotional events (including the CES Conference and X's Client Council meeting), and elsewhere to sell advertisers on the X platform; and (c) otherwise profit and gain advantage commercially.

82. Any release, license, consent, or authorization purporting to give Defendants use of Lemon's name, likeness, photo, reputation, and/or identity, is unenforceable due to unclear terms, a lack of mental capacity/competence, mistake, undue influence, and/or Defendants' unclean hands.

83. Defendants did not have a license, authorization, or consent to use Lemon's name, likeness, image, photo, reputation, and identity when they knowingly and intentionally did so without his authorization or consent, which was improper based upon fraud and has operated to undermine years of Lemon's careful career planning.

84. Defendants knowingly and intentionally used Lemon's name, likeness, photo, reputation, and/or identity for Defendants' commercial or other benefit.

85. The acts and omissions were authorized and ratified by Defendants.

86. Lemon is a nationally recognized journalist who is paid to endorse products and services through advertisements and through his association with such products and services. Lemon was deprived of the monetary value of having his name, likeness, photo, reputation, and identity used by Defendants and therefore, was deprived of money to

which he was entitled.

87.   Lemon's reliance on Defendants' fraud was a substantial factor in causing him harm.

88.   As a proximate result of the foregoing, Lemon has suffered actual damages, including emotional distress damages and loss of reputation and standing in the community, in an amount to be proved at trial but in any event in excess of the jurisdictional threshold of the Superior Court.

89.   As a proximate result of the foregoing, Lemon also seeks as damages any profits from Defendants' unauthorized use of Lemon's name, likeness, photo, reputation, and identity that are attributable to the use.

90.   Defendants' conduct was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, entitling Lemon to punitive damages against Defendants.

91.   Lemon also seeks an award of attorneys' fees and costs pursuant to Civil Code § 3344(a).

**FIFTH CAUSE OF ACTION**

**(Breach of Express Contract—Against Defendant X. Corp.**

**and Does 1 to 100, Inclusive)**

92.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

93.   Defendants, through their employees and agents, entered into an express agreement referred to as an exclusive content partnership deal with Lemon that was closed on or around January 8, 2024. Lemon and Defendants, through their employees and agents, made mutual promises of consideration pursuant to this express agreement. Lemon performed all duties required of him under the agreement.

94.   Defendants falsely claim that the contract was cancelled and/or that an express agreement was never agreed to, violating the express agreement they had with Lemon.

95.   As a proximate result of Defendants' willful breach of the express contract, Lemon has suffered and continues to suffer special and general damages, including losses of earnings and benefits, in a sum according to proof.

### SIXTH CAUSE OF ACTION

### (Restitution and Unjust Enrichment—Against All
### Defendants and Does 1 to 100, Inclusive)

96.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference, and, to the extent necessary, pleads this cause of action in the alternative.

97.   Lemon provided benefits and services to Defendants with an expectation that he would be fairly and fully compensated in return for providing those benefits and services.

98.   Defendants were fully and completely aware and understood that Lemon expected to be fairly and fully compensated in return for providing those benefits and services.

99.   The benefits and services that Lemon provided to Defendants to his detriment include, but are not limited to, (a) Defendants using Lemon's name, likeness, photo, reputation, and/or identity without compensation, and (b) Lemon expending considerable time, effort, and resources promoting, marketing, and advertising Defendants and their X platform.

100.   As a result of the illegal and wrongful conduct alleged herein, Defendants have been and will be unjustly enriched at the expense of Lemon if they are allowed to retain the income, profits, gains, benefits, and other monies that Defendants illegally and/or wrongfully obtained at the expense of Lemon.

101.   Lemon is entitled to restitution from Defendants. Defendants should be required to disgorge and return to Lemon all income, profits, gains, benefits, and other monies that Defendants illegally and/or wrongfully obtained at the expense of Lemon. The amount of this unjust enrichment exceeds the jurisdictional minimum to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Don Lemon, prays for judgment as follows on all causes of action:

1.  For general and special damages according to proof;

2.  For exemplary damages, according to proof;

3.  For punitive damages, according to proof;

4.  For pre-judgment and post-judgment interest on all damages awarded;

5.  For reasonable attorneys' fees;

6.  For costs of suits incurred;

7.  For declaratory relief in the following manner:

8.  For injunctive relief;

9.  For equitable relief; and

10. For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

ADDITIONALLY, Plaintiff, Don Lemon, hereby demands a jury trial on the causes of action set forth herein. The amount demanded exceeds $35,000.00.

Dated: August 1, 2024          SHEGERIAN & ASSOCIATES, INC.

By: _____
Carney R. Shegerian, Esq.

Attorneys for Plaintiff,
DON LEMON